**UNITED STATES of America, Appellee,**

v.

**Maria L. SAYAN, Appellant.**

**Nos. 89–3145, 91–3096.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 3, 1992.

Decided June 23, 1992.

Rehearing and Rehearing En Banc
Denied in No. 89–3145 Aug. 27, 1992.

Elaine R. Lubin, Washington, D.C. (appointed by the court), for appellant in Nos. 89–3145 and 91–3096.

Leslie Ann Wise, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and Joseph B. Valder, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

> *Fraud is infinite in variety; sometimes it is audacious and unblushing; sometimes it pays a sort of homage to virtue, and then it is modest and retiring; it would be honesty itself if it could only afford it. But fraud is fraud all the same.*
>
> *Reddaway v. Banham,*
> 1896 App.Cas. 199, 221.

Maria L. Sayan was convicted on one count of bank larceny in violation of 18 U.S.C. § 2113(b), six counts of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 and six counts of forgery and uttering in violation of D.C.Code §§ 22–3841 and 22–3842(a)(7). Sayan challenges her convictions on several grounds, alleging that (1) the district court improperly constructively amended the interstate transportation counts, (2) counts four and six of her indictment should have been treated as a single violation, (3) the facts of her case do not make out the elements of the crime of bank larceny, (4) her convictions cannot stand because the bank allowed her to use its money for a fee, (5) her convictions cannot stand because any misrepresentations she made were immaterial, (6) the district court's charge to the jury precluded a valid defense, (7) the district court precluded a key area of cross-examination, (8) the prosecutor committed misconduct by improperly questioning a defense expert witness before trial, (9) she received ineffective assistance of counsel, and (10) she was entitled to a hearing on her various fifth and sixth amendment claims. We reject all of Sayan's claims and therefore affirm her convictions.

I.

In 1981, Maria Sayan became president and sole owner of National Auto Brokers Wholesalers, Inc. ("NABW"), a business engaged in buying and selling used motor vehicles through a network of brokers.[1] Sayan's brokerage business relied on the use of "drafts." Drafts look and function very much like checks. There is at least one significant difference, however; while a drawee bank is authorized to pay a check when the holder presents it for payment, a drawee bank must present a draft to the drawer for authorization before making payment.

Sayan used a draft arrangement offered by The Riggs National Bank of Washington, D.C. ("Riggs"). This arrangement required her to maintain two accounts at

---

1. Sayan later developed International Auto Brokers Wholesalers, Inc. ("IABW") to deal in the export market. For the purpose of this opinion, NABW is used to refer to both NABW and IABW.

Riggs, a general checking account and a "zero balance" account. Both accounts were in the name of NABW. Each day at approximately 11:00 a.m., Riggs provided NABW with the control numbers of all drafts presented for payment since 11:00 a.m. the previous day. At this time Riggs debited the zero balance account in the total amount of the drafts presented. Sayan had until 3:00 p.m. that day to decide to authorize payment of the drafts. If she informed Riggs that a particular draft should not be paid, Riggs credited the zero balance account in the amount of that draft. Otherwise, NABW was required to attain a zero balance in the zero balance account at the end of that business day by depositing enough funds in the account to cover the drafts to be paid. Sayan provided the funds for the zero balance account through checks drawn on NABW's general checking account.

NABW's general checking account had its own special characteristic. Riggs gave NABW immediate credit for instruments deposited in the general checking account. NABW could then draw on the deposited funds immediately without waiting for the deposited instruments to "clear." This immediate credit for deposits combined with the delay between the time drafts were written and the time they were debited from the zero balance account allowed Sayan to engage in the activities that led to her indictment.

On May 2, 1983, Sayan wrote a $191,000 draft to York Aero, Inc. ("York"), to purchase an airplane. NABW's general checking account did not contain sufficient funds to cover the draft at the time it was written. Sayan therefore wrote several NABW drafts to SDF, Limited, (SDF) a company she had created for investment purposes. She endorsed the drafts and deposited some of them directly in NABW's general checking account and exchanged others at Perpetual Federal Savings & Loan for cashier's checks which she also deposited in NABW's general checking account. In both cases, she endorsed the instrument with an SDF stamp and then endorsed it again with an NABW stamp. See Tr. at 215–217. Notations on the drafts purported to reflect NABW's purchase of motor vehicles.[2] Because it received immediate credit for the amount of the deposited drafts and cashier's checks, NABW was able to draw on them in order to cover the draft written to York Aero when it was presented. Meanwhile, because the draft agreement provided that drafts were not to be presented to the drawer for approval until the day following presentment to the bank, the NABW drafts written to SDF and deposited in NABW's general checking account were not presented to Sayan for payment until the day after she had received credit for the deposit. These were paid through the use of additional fictitious drafts. This cyclical scheme of using fictitious drafts to cover drafts and checks written on insufficient funds, otherwise known as "kiting," provided the basis of the bank larceny count (count 1).

In addition, between August 10, 1983 and October 26, 1983, Sayan wrote three NABW checks and gave two Perpetual American cashier's checks to the investment firm of Drexel Burnham Lambert (Drexel) and covered them by using fictitious drafts. These six transactions provided the basis of the interstate transportation of money taken by fraud counts (counts 2, 4, 6, 8, 10 and 12). Each time Sayan negotiated one of these checks, the size of the overdraft in NABW's general checking account increased. When Riggs demanded payment in March 1984, the overdraft exceeded one million dollars.

The fictitious drafts prepared by Sayan provide an interesting story in themselves. Sayan admitted signing the names of others (as agents of drawer NABW) to drafts[3]

---

2. The vehicle identification numbers listed on the drafts contained either too many or too few digits, however, indicating that the motor vehicles did not exist.

3. Sayan claimed that it was NABW's policy to give blank drafts to its dealers. See Tr. at 589.

She admitted signing the names of dealers on drafts. Although she claimed she was authorized to sign drafts in the names of NABW dealers, see Tr. at 875–76, there is other testimony in the record indicating that she had no such authority, see Tr. at 271–272.

and endorsing drafts in the names of payees without permission. Many drafts were made payable to "Cleveland Coach," "Custom Coach," "Design Coach" and "Detroit Coach."[4] There was no evidence at trial that these companies actually existed. In addition, many of the drafts reflected trades of a "Mike Varde" who was allegedly referred to NABW by Mike Vardanian, a broker of used campers. According to the information included on the drafts, "Mike Varde" accounted for hundreds of thousands of dollars in trades per day. Interestingly, however, Sayan testified that she did not have Varde's telephone number, she never called him and she never had contact with any of his alleged trading partners. In addition, Vardanian testified that he did not know a Mike Varde. Over a ten and one-half month period, 1,863 NABW drafts were redeposited into NABW's general checking account. Six of these drafts, each written contemporaneously with a payment to York or Drexel, provided the basis of the forgery and uttering counts (counts 3, 5, 7, 9, 11 and 13).

Sayan was indicted on one count of bank larceny in violation of 18 U.S.C. § 2113(b), six counts of interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 and six counts of forgery and uttering in violation of D.C.Code §§ 22–3841 and 3842(a)(7). On May 16, 1989, a jury convicted her on all counts. She was sentenced to ten years on each count, with the sentences on the first two counts to run consecutively and on all other counts to run concurrently.

## II.

### A.

According to 18 U.S.C. § 2314 it is a crime to transport money in interstate commerce knowing it to have been "stolen, converted or taken by fraud." 18 U.S.C. § 2314. The six interstate transportation counts (counts 2, 4, 6, 8, 10 and 12) contained in Sayan's indictment allege that she

transported money "she knew to have been taken by fraud." In charging the jury, however, the district court included instructions on the definition of "stolen" and "converted" as well as "taken by fraud" and explained that the government must prove that she had "stolen, converted or taken by fraud." Sayan claims that her convictions for interstate transportation must be reversed because, by including the terms "stolen" and "converted" in its jury instructions, the district court constructively amended her indictment. Because Sayan's trial counsel failed to object to the instructions on this ground, we review the district court's actions for plain error. *United States v. Whoie*, 925 F.2d 1481, 1482 (D.C.Cir.1991).

As a general rule, "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Although this court has recognized that, in practice, jury instructions often deviate to some degree from the language of an indictment, "[a] substantial deviation of instructions from an indictment is impermissible because first it requires a defendant to answer a criminal charge that was not brought by a grand jury ... and second it denies the defendant sufficient notice to prepare and present an adequate defense." *United States v. Lemire*, 720 F.2d 1327, 1344 (D.C.Cir.1983) (citations omitted), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). A defendant's right to be charged by a grand jury is violated "only if the deviation in proof or instructions from the specifics of the indictment affects an essential element of the offense charged." *Id.* at 1345.

An indictment may be amended either literally or constructively. *United States v. Mangieri*, 694 F.2d 1270, 1277 (D.C.Cir. 1982). A constructive amendment occurs when " 'the evidence presented at trial *and* the instructions given to the jury "so mod-

---

4. Because some of the instruments were apparently illegible, it is unclear exactly how many drafts were written to these alleged companies. However, Sayan admitted signing a significant number of them. *See* Tr. at 928–933; Exs. 300–Cleveland, 300–Custom, 300–Design and 300–Detroit.

if[y] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." ' " *Id.* (emphasis in original) (quoting *United States v. Gonzalez,* 661 F.2d 488, 492 (5th Cir.1981) (in turn quoting *United States v. Ylda,* 653 F.2d 912, 914 (5th Cir.1981))). The Fifth Circuit has held that the constructive amendment of an indictment constitutes fatal error. *Gonzalez,* 661 F.2d at 492 (citing *Stirone,* 361 U.S. at 219, 80 S.Ct. at 274).

We conclude that the district court's instructions in this case do not amount to a constructive amendment of Sayan's indictment. The proof offered by the government at trial did not vary from the allegations in the indictment. Sayan was charged with knowingly taking money from a bank by illegal means and transporting that money in interstate commerce. Although the district court's instructions conceivably could have broadened the theories regarding the method she used to achieve this end, given the evidence at trial Sayan could not have been convicted of a crime that differed materially from that alleged in the indictment.[5]

▪ Having concluded that the district court's instructions did not constitute a constructive amendment of Sayan's indictment, we turn to the issue of whether the instructions merit reversal on some other ground. We conclude that the disputed jury instructions do not constitute plain error, if error at all. The instructions would constitute plain error only if they resulted in a miscarriage of justice. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). We have recently held that in evaluating whether a jury instruction is plainly erroneous, we will consider "the evidence adduced at trial, the arguments of counsel, and the content of the entire jury instruction." *United States v. Chan Chun–Yin,* 958 F.2d 440, 444 (D.C.Cir.1992) (citing *Whoie,* 925 F.2d at 1485). In *Chan Chun–Yin,* we held that potentially overbroad jury instructions were not plainly erroneous where the evidence substantially supported the proper charge, both counsel focused their closing arguments on the allegations charged in the indictment and the court mitigated the effect of its error by reading the indictment to the jury and allowing the jury to take the indictment into the jury room. *Id.* As we discuss more fully below, *infra* pp. 60–61, the government produced evidence supporting the theory that Sayan gained access to Riggs' money by fraudulent means. Both the government's and Sayan's summations focused on this theory of the case. *See* Tr. at 1641 ("the common denominator is sort of intent to defraud"); Tr. at 1681 ("[i]t is only an intent to defraud the bank if you believe there is a scheme, and there can't be a scheme"). Finally, we note that the judge read the indictment to the jury and allowed the jury to take a copy of the indictment into the jury room. *See* Tr. at 1719–25, 1749. We therefore conclude that the jury instructions on the interstate transport counts do not constitute plain error.

**B.**

▪ Counts 4 and 6 were based on delivery of two sequentially numbered cashier's checks to Drexel's Washington office on the same day. Sayan argues that the logical inference to be drawn from this course of events is that the checks were delivered (and hence negotiated) together and that

---

**5.** In *Lyda v. United States,* 279 F.2d 461, 464 (5th Cir.1960), the Fifth Circuit held that an indictment charging a defendant with knowingly stealing goods in violation of section 2314 supported a conviction of embezzlement of those goods. After explaining that section 2314 was designed to punish illegal taking in whatever form, the court stated: "Since the aim of Congress was to reach all such deprivations, it would distort that purpose if by a sort of reverse process the transaction under review had to consider whether the property was stolen *or* converted *or* taken by fraud." *Id.* (emphasis in original). *See also Bell v. United States,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (holding that "tak[ing] and carr[ying] away, with intent to steal or purloin" is broader than common law larceny and includes taking by false pretenses). Although we do not decide the issue on this basis, we note that these cases might support a conclusion that the phrase "taken by fraud" as used in Sayan's indictment encompasses "stolen, converted or taken by fraud."

they travelled in interstate commerce together. Accordingly, Sayan maintains that delivery of these checks constituted one violation rather than two. *See Cabbell v. United States,* 636 F.2d 246, 248 (8th Cir. 1980) (Where several instruments are negotiated simultaneously, only one violation has occurred); *United States v. Dilts,* 501 F.2d 531, 535 (7th Cir.1974) (same).

It is unnecessary to decide this issue on the merits. The resolution would result, at best, in our reversing a sentence that would otherwise run concurrently with other sentences we affirm today. Because resolution of this issue will have no effect on the severity of Sayan's sentence, the interest in judicial economy counsels in favor of vacating Sayan's conviction on one of the counts without reaching the merits of the issue. *See United States v. Hooper,* 432 F.2d 604, 606 (D.C.Cir.1970). We therefore vacate Sayan's conviction on count 6.

### C.

Sayan argues that the evidence produced at trial is insufficient to support her convictions. First, to the extent the charges required her to have committed fraud or larceny by false pretenses (e.g. counts 1, 2, 4, 6, 8, 10, 12), she claims that the unauthorized writings on the drafts were immaterial to the bank and that any other misrepre-

sentations do not amount to fraud. She next claims that her overdrafts were authorized by the bank. Finally, regarding the bank larceny count only, Sayan claims that the evidence does not establish the essential element of "taking and carrying away." We reject all of these contentions.

■ Sayan urges that any false signatures or endorsements on the checks and drafts she deposited were immaterial to Riggs. We disagree. If Sayan had merely made the drafts payable to herself, the bank would not have granted her immediate credit. By creating fictitious payees and forging endorsements, however, she was able to convince Riggs to accept her deposits. We therefore conclude that the evidence supported each of the fraud-based counts because the bank relied on, and was misled by, the false information included on the drafts.[6] We further conclude that the totality of the evidence, including Sayan's forgeries, demonstrates Sayan's intent to use the check kiting scheme to defraud Riggs. *See United States v. Swearingen,* 858 F.2d 1555, 1558 (11th Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989) (totality of evidence, including material misrepresentations demonstrated by effort to conceal activities from bank, supports finding of intent to defraud).[7]

---

6. Sayan further argues that because the false signatures were immaterial to the bank her convictions under the District of Columbia forgery statute cannot stand. Again we disagree. The D.C. forgery statute has been interpreted to reach "the signing of a fictitious name, accompanied by the necessary fraudulent intent, to an instrument capable of working a prejudice to the interests of another." *Ashby v. United States,* 363 A.2d 685, 687 (D.C.1976). Sayan's conduct includes all of the *Ashby* factors.

7. We note that had Sayan's criminal activity continued until after October 12, 1984, she could have been charged with bank fraud in violation of 18 U.S.C. § 1344. According to all circuits that have addressed the issue, subsection (1) of section 1344 does not require any material misrepresentation; a check kiting *scheme* can support a conviction of bank fraud under 18 U.S.C. § 1344(1). *See United States v. Stone,* 954 F.2d 1187 (6th Cir.1992); *United States v. Fontana,* 948 F.2d 796, 802 (1st Cir. 1991); *United States v. Celesia,* 945 F.2d 756,

758–59 (4th Cir.1991); *United States v. Falcone,* 934 F.2d 1528, 1541 n. 30 (dicta), *vacated,* 939 F.2d 1455 (11th Cir.1991), *reinstated in relevant part,* 960 F.2d 988 (1992) (*en banc*); *United States v. Cronic,* 900 F.2d 1511, 1515 (10th Cir. 1990); *United States v. Medeles,* 916 F.2d 195, 201 (5th Cir.1990) (dicta); *United States v. Schwartz,* 899 F.2d 243, 246 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *United States v. Bonnett,* 877 F.2d 1450, 1454 (10th Cir.1989); *United States v. Kucik,* 844 F.2d 493, 499–500 (7th Cir.1988); *cf. United States v. Poliak,* 823 F.2d 371 (9th Cir. 1987) (each check in check kiting scheme constitutes separate violation of section 1344). On the other hand, subsection (2) of section 1344 does require a material misrepresentation and, as we conclude with reference to Sayan's convictions on counts 1, 2, 4, 6, 8, 10 and 12, her material misrepresentations would have also supported a conviction under 18 U.S.C. § 1344(2). The bank fraud statute, however, was enacted after Sayan's check kiting scheme terminated.

Sayan further claims that the evidence shows that the bank knew about her overdrafts and therefore her actions were authorized. We flatly reject this assertion. While the evidence indicates that the bank may have been aware that an overdraft existed in NABW's general checking account, the evidence also manifests that it was unaware of the *reasons* for the overdraft and would have strongly objected to Sayan's activities had it known of the fictitious nature of her transactions. *See* Tr. at 1606. Riggs' decision to give immediate credit on deposits does not give its customers the authority to engage in kiting schemes.

Lastly, Sayan challenges the sufficiency of the evidence underlying her conviction of bank larceny. 18 U.S.C. § 2113. Section 2113(b) defines bank larceny as "tak[ing] and carr[ying] away, with intent to steal or purloin" bank funds. Sayan argues that the government did not prove that she took or carried away the funds at issue. Because Sayan failed to raise this issue in either of her motions for judgment of acquittal, we review this objection for plain error. *See United States v. McCray*, 433 F.2d 1173, 1175 n. 2 (D.C.Cir.1970).

In *Bell v. United States*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), the Supreme Court interpreted section 2113(b) to proscribe the crime of false pretenses. In so holding, the Court noted that "§ 2113(b) does not apply to a case of false pretenses in which there is not a taking and carrying away." *Id.* at 361, 103 S.Ct. at 2402. The *Bell* opinion does not define "taking and carrying away." At least three circuits, however, have concluded that a defendant need not *physically* take and carry away bank money in order to violate the statute. *See United States v. Kucik*, 844 F.2d 493, 499–500 (7th Cir.1988) (check kiting scheme); *United States v. Bradley*, 812 F.2d 774, 779 n. 3 (2d Cir.) (statute violated where defendant wrote

checks against account knowing money in account did not belong to him), *cert. denied*, 484 U.S. 832, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987); *United States v. Morgan*, 805 F.2d 1372, 1377 (9th Cir.1986) (defendant and accomplice directed innocent agent to transfer funds), *cert. denied*, 480 U.S. 949, 107 S.Ct. 1612, 94 L.Ed.2d 797 (1987). In *Kucik*, however, the Seventh Circuit concluded that the holding in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982),[8] applies to section 2113(b) cases and suggested that check kiting must be accompanied by misrepresentations beyond the mere deposit of checks supported by insufficient funds to violate section 2113(b). 844 F.2d at 500. Sayan's forgeries constitute affirmative misrepresentations which support a charge of false pretenses notwithstanding *Williams*. We therefore conclude that Sayan, by utilizing a fraudulent kiting scheme, took and carried away money from Riggs. The district court committed no error, much less plain error, on this issue.

### D.

Sayan objects to the district court's instruction to the jury that Riggs' knowledge of her overdrafts would constitute a valid defense only if "[Riggs] had authorized the defendant to take such sums." Sayan claims that this instruction denied her the defense that she believed the bank knew of and approved her actions and that she therefore lacked the specific intent necessary to establish her guilt. Because she did not request a "mistaken belief" instruction at trial, Sayan is not entitled to have her convictions overturned on this ground. *See United States v. Mathis*, 535 F.2d 1303, 1305 (D.C.Cir.1976) ("The settled law in this circuit is that a defendant is entitled to an instruction on his theory of the case when properly requested by counsel and when the theory is supported by any evidence."). Had Sayan properly requested

---

8. *Williams* held that the deposit of a check supported by insufficient funds does not constitute a violation of 18 U.S.C. § 1014 (the bank false statement statute), which makes it a crime to "knowingly mak[e] any false statement or report" to a bank insured by the Federal Deposit Insurance Corporation. *Williams* rests on the theory that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" 458 U.S. at 284, 102 S.Ct. at 3091.

such an instruction and the district court failed to give it, however, she would not be entitled to reversal because the substance of her theory was conveyed in the jury instructions as a whole. *See United States v. Tarantino*, 846 F.2d 1384, 1400 (D.C.Cir.), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988).[9]

### E.

■ On direct examination by the government, Vardanian denied knowledge of the alleged Mike Varde. Defense counsel attempted to introduce in evidence a 1984 sketch of Varde to cross-examine Vardanian.[10] The trial judge refused to allow the sketch to be introduced because defense counsel had not produced it in response to the government's reciprocal discovery request. Sayan claims that the exclusion of the sketch violated her right to confront the witnesses against her.

When the government makes a proper reciprocal discovery request, a defendant is required to produce tangible objects he "intends to introduce as evidence in chief at the trial." Fed.R.Crim.P. 16(b)(1)(A). If the defendant fails to comply with this procedure, a court may "prohibit the [defendant] from introducing evidence not disclosed." *Id.* at 16(d)(2). The trial judge's ruling on these matters will be overturned only for an abuse of discretion "prejudicial to the substantial rights of the defendant." *United States v. Woosley*, 761 F.2d 445, 448 (8th Cir.1985); *see also United States v. Butler*, 924 F.2d 1124 (D.C.Cir.) (discovery matters rest in trial judge's discretion and no abuse of discretion will be found absent prejudice), *cert. denied*, — U.S. ——, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991). Assuming *arguendo* the trial judge erred in excluding the sketch, we do not believe the exclusion prejudiced Sayan. Vardanian unequivocally testified that he did not know Varde. Sayan was free to

cross-examine him on this point.[11] Moreover, the evidence overwhelmingly indicated that, regardless of Varde's existence, the transactions attributed to him were fictitious. Because the evidence demonstrates beyond a reasonable doubt that Sayan's transactions were fictitious, the exclusion of the sketch amounts to harmless error at most. *See United States v. Sutton*, 801 F.2d 1346, 1370–71 (D.C.Cir.1986).

### F.

■ Sayan alleges three instances of prosecutorial misconduct. Only one merits discussion. With defense counsel's permission, the prosecutor had several conversations with Thomas Seay, an accountant appointed by the court to serve as Sayan's expert. The prosecutor first spoke with Seay during a series of pretrial conferences Seay attended at defense counsel's request. The prosecutor had subsequent telephone conversations with Seay. Defense counsel advised Seay that these interviews were permissible and that he should do what he thought best in dealing with the prosecutor. Sayan argues that her communications with Seay were protected by the attorney-client privilege and that the prosecutor's conversations with Seay allowed him access to privileged information. Because she told Seay that *she* did not want him talking with the prosecution, she claims her defense was compromised when Seay in fact talked to the prosecutor.

■ Assuming *arguendo* that some of the communications between Sayan and Seay were privileged, our review of the record reveals that no privileged information was revealed to the government. Information is shielded by the attorney-client privilege only if it relates to a fact conveyed to the lawyer (or in this case his agent) by his client. *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984) (citing *United States v. United Shoe Mach.*

---

9. The trial judge instructed the jury that it must find "the defendant took money that at the time of the taking she knew she was not entitled to," Tr. at 1718, and defined "intentionally" as "acting deliberately or purposely as opposed to acting by mistake or carelessness," Tr. at 1728.

10. The sketch was a police rendering of a description offered by Sayan. *See* Tr. at 798–99.

11. Because of her opportunity to cross-examine Vardanian, Sayan's right of confrontation was not violated.

*Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950)). The information disclosed by Seay to the prosecutor included only Seay's personal opinions and observations. None of Seay's discussions with the prosecutor disclosed the content of any of Sayan's confidential communications. For example, Sayan complains that Seay told the prosecutor that "he could not dispute that any of the instruments in the indictment had been negotiated as there described." Sayan Br. at 30. This statement merely expressed an opinion (or the lack of one) Seay formed after reviewing evidence available to both sides. It did not disclose any confidential information obtained from conversations with Sayan. Sayan also claims that because Seay pointed out a flaw in the prosecution's theory of the case, the prosecutor was able to recast the case against her. Here again, the knowledge Seay conveyed to the prosecutor was based on Seay's expertise and did not involve information Sayan gave him.

A stronger argument for Sayan arises from the following question posed by the prosecutor at trial: "Did you tell me on the phone one time, Mr. Seay, that … *after having some conversations with her about her background,* you realized that [Sayan] was really sort of a sly fox?" *See* Tr. 1508 (emphasis added). We have held that "[t]he attorney-client privilege covers only confidential communications between attorney and client, and it focuses on the attorney-client relationship. Thus, information other than 'communications,' or communications that do not involve both attorney and client, are unprotected." *In re Sealed Case,* 676 F.2d 793, 808–09 (D.C.Cir.1982) (footnote omitted). In referring to Sayan as a "sly fox," Seay merely expressed an opinion he formed based on his conversations with her. Although this opinion may have been based in whole or in part on the content of their communications, it did not reveal the subject matter of those communications. Because it was Seay's general observation, rather than a revelation of specific communications, the "sly fox" comment was not privileged. *See Weinstein, supra,* ¶ 503(a)(3)[01], at 503–37; *cf. United States v. Pipkins,* 528 F.2d 559, 563 n. 2 (5th Cir.1976) ("As a general rule, identifying physical characteristics such as one's style of handwriting, readily observable by anyone, are not subject to the attorney-client privilege"), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976).

In the absence of evidence that the prosecutor either sought or obtained privileged information, we find no prosecutorial misconduct.[12] We know of no caselaw holding that a prosecutor cannot communicate with a defense expert either at a pretrial conference or by telephone.[13] The fact that Seay may have relied on arguably imprudent advice of defense counsel does not alter our conclusion.

### G.

▮ Sayan claims that she is entitled to a new trial because the trial judge forced her lawyer, who had taken over the defense one week before trial was to begin, to proceed unprepared. She argues that the trial judge's action forced her lawyer to choose between her best interests and his own and thus abridged her right to counsel. Specifically, she contends that her counsel should have requested a continuance but failed to do so because he was afraid that the judge would take action against him and his law firm if he made such a request. While we recognize that a conflict between

---

**12.** Seay and the prosecutor disagree on whether the prosecutor cautioned Seay against revealing confidential information (*see* Seay Affidavit ¶ 13; Valder Declaration ¶ 2). Because it appears that no confidential information was released, however, the prosecutorial error, if any, was harmless.

**13.** Sayan relies on *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975), maintaining that a prosecutor may not speak with a defense expert witness before trial. *Alvarez,* however, discusses the fact that communications between a criminal defendant and his psychiatric expert may be privileged and that the prosecution is not entitled to such privileged communications. *Id.* at 1046–47 ("Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand.").

a lawyer and his client may provide the basis of a new trial, *see Walberg v. Israel,* 766 F.2d 1071, 1074 (7th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), we find no such conflict here.

The district court found that Sayan's counsel was adequately prepared and therefore her representation was not "adversely affected." *See* Memorandum Opinion of 4/23/91 (Mem.Op.) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)). Based on the record, this finding is not clearly erroneous. Moreover, the judge made it clear that he would have refused to grant a continuance had one been requested, *id.* at 24; a lawyer is not "ineffective" when he fails to file a meritless motion, *see United States v. Wood,* 879 F.2d 927, 933 (D.C.Cir. 1989).[14] Finally, we note that while her case was pending, Sayan dismissed at different times two court appointed lawyers who were prepared to try the case.[15] In dismissing these lawyers, she may have waived by implication her right to counsel. *See, e.g., United States v. Moore,* 706 F.2d 538, 540 (5th Cir.) (persistent, unreasonable demand for dismissal of counsel and appointment of new counsel is functional equivalent of knowing and voluntary waiver of counsel), *cert. denied,* 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983).[16]

## H.

■■■■■ Sayan alleges several additional instances of ineffective assistance of counsel. The trial judge entertained motions on these claims and subsequently denied all of them. *See* Mem.Op. at 20. We evaluate ineffective assistance claims according to the test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To support her claim

of a sixth amendment violation based on ineffective assistance of counsel, Sayan must show that her lawyer's performance was deficient and that the deficiency prejudiced her. *Id.* at 687, 104 S.Ct. at 2064.

Sayan first contends that her lawyer should have prevented the prosecutor from communicating with her defense expert. As we have already noted, the communications that took place between the prosecutor and Seay did not compromise her defense or violate the attorney-client privilege. While defense counsel could have advised Seay that he was not obliged to speak with the prosecutor, our review of the record leads us to conclude that his failure to give this advice did not prejudice Sayan as required under *Strickland.*

■■■■ Sayan also claims that her lawyer should have asked for a special instruction on unanimity. A special unanimity instruction is required only when there is a genuine risk of juror confusion or of conviction resulting from different jurors concluding the defendant committed different acts. *See United States v. North,* 910 F.2d 843, 876, *modified in part and reh'g denied,* 920 F.2d 940 (D.C.Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). In most cases a general instruction on unanimity suffices, *id.,* and a general instruction was given here. The government correctly points out that, with the exception of count one, each of the counts in this case involved discrete transactions. Count one, which outlined Sayan's scheme to defraud, did rest on a series of allegedly wrongful acts. In *United States v. Hubbard,* 889 F.2d 277, 279 (D.C.Cir. 1989), however, we held that a count charging a series of similar acts in furtherance of a fraudulent scheme falls into a single

---

**14.** We note that in a post-trial declaration, Sayan's trial lawyer stated that "[Sayan's former lawyer] told me that the Court had informed him there would be no further continuances and that the case would be tried beginning May 1, 1989." Declaration of Kenneth Man at 1.

**15.** After dismissing her two court-appointed lawyers, Sayan hired David Solomon, a lawyer with the firm of Kroop, Kurland & Rosenberg. Solomon represented Sayan between March 8, 1989 and April 20, 1989, when he withdrew

because of medical problems. Solomon was replaced by Kenneth Man, also of Kroop, Kurland & Rosenberg, who represented Sayan at trial.

**16.** We recently addressed a similar situation in *United States v. Poston,* 902 F.2d 90, 97 (D.C.Cir. 1990), when we refused to recognize an ineffective assistance of counsel claim in the face of a last minute substitution of lawyers.

conceptual grouping that does not require a special unanimity instruction. Accordingly, we reject Sayan's ineffective assistance claim based on her lawyer's failure to request such an instruction.[17]

### I.

■ Sayan claims that 28 U.S.C. § 2255 entitles her to an evidentiary hearing on the fifth and sixth amendment claims contained in her motion to vacate. We disagree. Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, a motion to vacate conviction may be denied without a hearing "if it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief." Rule 4(b) fol. § 2255. This rule is especially applicable if the same judge who tried the case rules on the section 2255 motion as occurred here. *See Blackledge v. Allison*, 431 U.S. 63, 74 n. 4, 97 S.Ct. 1621, 1629 n. 4, 52 L.Ed.2d 136 (1977). Moreover, we have held that when a section 2255 motion involves ineffective assistance of counsel claims, no hearing is necessary if the alleged deficiencies of counsel did not prejudice the defendant. *See United States v. Patterson*, 652 F.2d 1046, 1048 (D.C.Cir.) (no hearing necessary where it is clear from record that competent counsel could not have affected outcome), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981). We have already concluded that Sayan was not prejudiced by the alleged deficiencies of her lawyer. *See supra* pp. 64–65. The district court thus properly declined to hold a hearing.

### III.

We have reviewed Sayan's other claims and have concluded that their patent lack of merit requires no additional discussion. Accordingly, Sayan's convictions are

*Affirmed.*

■

---

17. We have reviewed Sayan's additional ineffective assistance claims and conclude that they are all without merit.